COURT OF APPEALS OF VIRGINIA


Present:  Chief Judge Fitzpatrick, Judges Bray and Annunziata


ARMANDO GONZALES-LOYA

                                   MEMORANDUM OPINION[*] BY
v.    Record No. 1670-99-4          JUDGE RICHARD S. BRAY
                                         JUNE 20, 2000
COMMONWEALTH OF VIRGINIA


        FROM THE CIRCUIT COURT OF SHENANDOAH COUNTY
              H. Selwyn Smith, Judge Designate

        (Barry D. Murphy, on brief), for appellant.
        Appellant submitting on brief.

        (Mark L. Earley, Attorney General;
        Virginia B. Theisen, Assistant Attorney
        General, on brief), for appellee.  Appellee
        submitting on brief.


     Armando Gonzales-Loya (defendant) was convicted in a bench

trial of conspiracy to distribute cocaine in violation of Code

§ 18.2-256.  On appeal, he challenges the sufficiency of the

evidence to support the conviction.  Finding the evidence

sufficient, we affirm the trial court.

     The parties are fully conversant with the record, and this

memorandum opinion recites only those facts necessary to a

disposition of the appeal.

---

        * Pursuant to Code § 17.1-413, recodifying Code
§ 17-116.010, this opinion is not designated for publication.

I.

In reviewing the sufficiency of the evidence, we consider the record "'in the light most favorable to the Commonwealth, giving it all reasonable inferences fairly deducible therefrom. In so doing, we must discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth . . . .'" Watkins v. Commonwealth, 26 Va. App. 335, 348, 404 S.E.2d 856, 866 (1998) (citation omitted). The credibility of the witnesses, the weight accorded testimony, and the inferences to be drawn from proven facts are matters to be determined by the fact finder. See Long v. Commonwealth, 8 Va. App. 194, 199, 379 S.E.2d 473, 476 (1989). The judgment of the trial court will not be set aside unless plainly wrong or unsupported by the evidence. See Code § 8.01-680.

Viewed accordingly, the instant record discloses that, in early December, 1998, Amy Sue Burker accompanied her sister, Tammy Turner, to the "Blue Ridge Motel" in Shenandoah County. Upon arrival, Turner, then in possession of $1,100 in cash, entered a room at the motel. Turner soon exited, advised Burker "it was okay to come in," and the sisters joined defendant, "Lolo," in the room. Burker was unacquainted with Lolo, but knew this "was not [Turner's] first meeting" with him.

Following undisclosed discussion among the three, "a telephone call was made" by defendant and, "half an hour" later,

-

an unidentified "gentleman" arrived at the room.  Turner and the man immediately "went into the bathroom," "had conversation" during which "the money was exchanged," and returned after "five minutes, tops."  Turner and defendant then discussed "drugs . . . she had given" defendant, and related money he was "to give to her, to give to this other gentleman."  After defendant assured Turner "he had taken care of it," the sisters departed the motel, with Turner in possession of a "plastic baggie" containing "a rock of a white powder substance," and no money.

Later in December, Burker and Turner returned to the motel.  On this occasion, Burker remained "outside" while Turner "dropped off" an undisclosed amount of money and "[g]ot more of the white powder substance in the baggie."[1]

On December 7, 1998, Burker contacted Deputy Sheriff Alfred J. Buynar to discuss her "sister and drugs."  Buynar contacted law enforcement officers involved with the "Northwest Regional Drug Task Force" and arranged a joint meeting with Burker.  The officers suggested Burker "wear [a] wire" and deliver $1,400 "marked money" to defendant at the motel room to "pay off [her] sister's debt" "for something that had already been fronted."  Burker agreed, was provided the necessary equipment and cash, and proceeded to the Blue Ridge Motel to contact defendant.

---

[1] Burker identified the "substance" repeatedly referenced in the record as "coke," "a drug," an "illegal substance."

-

When Burker entered the motel room, defendant was present, together with a man identified only as "Valbosa" or "Villalobos," unable to "speak English."  Burker asked defendant "how much [her] sister owed."  When defendant purportedly "translate[d]" Burker's comments for the other man, the man "picked up" "some kind of electronic device," spoke "back and forth" with defendant, and defendant reported to Burker that her sister "owed $1,700."  Burker then paid defendant the police funds and requested that he "front" some "[c]oke" to her.  In response, defendant explained, "they didn't have none.  That they were waiting on [Turner's] money."  However, he instructed Burker to "call the next day, at twelve o'clock, and [she] could arrange a time for the next night, to come over and get the powder substance."

As a result of Burker's undercover activity, a search warrant was obtained and executed at the motel room, still occupied by defendant and the man.  During the attendant search, the officers seized "a little digital scale," with cocaine residue, from beneath a bed, "a box of sandwich bags," "a two hundred-gram weight," a notepad containing a "list of . . . numbers," and "two twenty dollar phone cards," items which Investigator David Paul Mason of the drug task force described, without objection, as common to "drug dealers."  The "marked" currency was found under a refrigerator.

-

During the search, Mason answered the telephone on five occasions, with each caller asking to speak with "Tony or Lolo." Responding in a voice disguised "to sound like a Mexican," Mason advised, "they were not [here], that they would be back in an hour" and "ask them if they were looking." The callers "would say yes or no, or whatever," and several indicated "that they would come to the hotel room." "[A] total of six people came to the room that night and early morning while [they] were doing the search warrant," including Courtland Lee Polk, III, and James Robert Clark, III.

Polk and Clark testified that they came to the motel in the early morning of December 8, 1998, after first telephoning, intending to purchase "[t]hree and a half grams of cocaine" for $200 from defendant. The two men had engaged in a like transaction with defendant during the previous week, also at the motel. Each acknowledged the powder gave them a "buzz," and Clark, an admitted user of cocaine for "about four years," recalled that the "powder" previously purchased from defendant produced "the same results" as "coke."

II.

"A conspiracy is 'an agreement between two or more persons by some concerted action to commit an offense.'" Smith v. Commonwealth, 19 Va. App. 594, 598, 453 S.E.2d 572, 575 (1995) (citations omitted). "There can be no conspiracy without an agreement, and the Commonwealth must prove beyond a reasonable

-

doubt that an agreement existed."  Floyd v. Commonwealth, 219
Va. 575, 580, 249 S.E.2d 171, 174 (1978) (citation omitted).
Thus, "[i]n order to establish the existence of a conspiracy, as
opposed to mere aiding and abetting, the Commonwealth must prove
'the additional element of preconcert and connivance not
necessarily inherent in the mere joint activity common to aiding
and abetting.'"  Zuniga v. Commonwealth, 7 Va. App. 523, 527,
375 S.E.2d 381, 384 (1988) (citation omitted).  However,
"[p]roof of an explicit agreement is not required" but "may, and
frequently must, rely on circumstantial evidence," inferences
drawn from "'overt actions'" and a "'collocation of
circumstances,'" which evince agreement upon a "'common purpose
and plan.'"  Combs v. Commonwealth, 30 Va. App. 778, 787, 520
S.E.2d 388, 392 (1999) (citation omitted).

"As a general rule a single buyer-seller relationship,
standing alone, does not constitute a conspiracy."  Zuniga, 7
Va. App. at 528, 375 S.E.2d at 385.  "If, however, the evidence
demonstrates:  (1) 'that the seller knows the buyer's intended
illegal use,' and (2) 'that by the sale the seller intends to
further, promote and cooperate in the venture,' the existence of
a conspiracy to distribute between a seller and a buyer, inter
se, has been proved."  Id. at 529, 375 S.E.2d at 385 (citation
omitted).  Or, "if two or more people agree in advance to act in
concert to sell drugs, where [for example] one serves as the
supplier and the other as the 'runner,' an agreement to

-

distribute drugs exists and a conspiracy has been proven."
Feigley v. Commonwealth, 16 Va. App. 717, 723, 432 S.E.2d 520, 524 (1993).

Here, the evidence sufficiently established a conspiracy between sellers to distribute cocaine to Turner, Burker and others. The initial encounter between the sisters and defendant, during which defendant summoned an unidentified man to the room to facilitate a sale of cocaine to Turner, together with related conversation, clearly established an agreement between the two men to distribute the drug. Burker's final contact with defendant, coordinated with police, provided further proof that defendant and another shared an interest in Turner's debt for cocaine previously purchased from defendant. Moreover, when Burker asked defendant to "front her" cocaine, his response that "they didn't have none" because "they were waiting on Turner's money" to re-supply clearly reflected agreement, preconcert and connivance with others. (Emphasis added.) Such circumstances, aided by the presence of paraphernalia usual in drug trade and the numerous contacts at the motel room by persons seeking to purchase cocaine, sufficiently supports the finding of a conspiracy between defendant and another to distribute the drug.

Accordingly, we affirm the trial court.

Affirmed.

-